# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 2:14-cr-64-JDL** |
| **PAUL HENRY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER ON MOTION TO SUPPRESS

Paul Henry is charged with two counts of exploitation of children, 18 U.S.C. § 2251(a), in connection with the production of child pornography.  He has moved to suppress as evidence his iPhone, its contents, and evidence derived from its search, as well as statements he made to law enforcement officers on February 12, 2014, after the police visited his motel room in search of a missing woman, and statements he made on April 16, 2014, following his arrest.  ECF No. 26.  A hearing was held on the motion on August 13 and 14, 2014, and the parties submitted post-hearing memoranda on the issue of whether I should grant Henry's request for a *Franks* hearing.  *See Franks v. Delaware*, 438 U.S. 154 (1978).  I have carefully considered the motion and the evidentiary record and, for reasons I will explain, I deny the motion.

# I.  Factual Background

## A.    Initial Investigation

On February 12, 2014, the Portland Police Department received a report from an agent of the Detroit, Michigan, office of the Department of Homeland Security Investigations (HSI) regarding a woman being held against her will in Portland.[1]  The substance of the report was that a young woman, who had previously been a victim of sex trafficking, had called her mother in Michigan stating that she was being held against her will at a hotel in Portland.  Notwithstanding her mother's urging, the woman did not feel comfortable calling 9-1-1.  The woman was identified by name, and is referred to in this decision by her initials, A.H.  She had previously made calls to her mother from New York phone numbers that were linked to prostitution ads posted on the website Backpage.com.  Prior to her arrival in Maine, the woman had worked as a prostitute in New York City.  In addition, it was reported that A.H. is developmentally delayed and functions at the level of an 11 or 12-year-old child.

Portland Police Officer Daniel Townsend followed up on this information by contacting a detective working in the Queens precinct of the New York Police Department.  The detective provided general information concerning A.H., including that she had been arrested in Manhattan at a hotel; that she had reported being raped and there were indicators that the rape was in relation to prostitution; and

---

[1] Four witnesses testified at the suppression hearing in addition to the defendant, Paul Henry: Officers Daniel Townsend and Mark Keller, both assigned to the Crime Reduction Unit of the Portland Police Department, Special Agent David Pawson of the Department of Homeland Security Investigations, and Special Agent Christopher Peavey of the Federal Bureau of Investigations.

that A.H. may have been trafficked from Michigan to New York for purposes of prostitution.

After examining guest lists from several hotels and motels in the greater Portland area where prostitution and other illegal activity has been known to occur, Officer Mark Keller of the Portland Police Department identified that Paul Henry was staying at a motel in South Portland. Keller was familiar with Henry because Henry had previously been identified by the Portland Police Department, the Maine Drug Enforcement Agency, and federal agencies as a person involved in drug trafficking and sex trafficking in the Portland area. Henry had been summonsed by Portland police for being in possession of stolen property and then arrested for having refused to sign a summons related to marijuana, and a records check revealed that he had an extensive criminal history in New York related to charges of drug distribution, weapons, firearms, and resisting arrest or a similar offense.[2]

The Portland police had no information at that point that linked Henry to A.H. They had previously received information, however, indicating that Henry had ties to New York and was involved in sex trafficking there. In addition, the Portland police had previously received information that connected Henry to the temporary disappearance of a 15-year-old girl from the Portland area in July 2013. The girl's aunt had reported her missing after she had abruptly left her home in the company of a man who went by the initials "L.T." The aunt reported that the girl may have

---

[2] No evidence was introduced as to the specific crimes Henry has been previously convicted of, other than that he has a "felony conviction." Officer Townsend testified that Henry had been arrested by the Portland Police Department on "multiple occasions."

been trafficked out-of-state for purposes of prostitution. The girl subsequently returned home in the company of L.T. a few hours after the police had spoken to someone who knew both L.T. and the girl, and that person had contacted L.T. or the girl by phone. Approximately two-weeks later, Henry's vehicle was stopped by Portland police and Officer Keller was called to the scene. Henry consented to Keller examining Henry's two cell phones. Keller found text messages on one of the phones between that phone and the girl's cell phone number, and also discovered the girl's name in the phone's contacts. Henry told another Portland police officer at the scene that he went by the initials L.T. Henry was not arrested at that time and was permitted to leave.

## B.    Investigation at the Motel

Officers Townsend and Keller travelled to the South Portland motel where they spotted Henry's car in the parking lot and learned that he had rented room 421. They were met at the motel by their supervisor, Sergeant Frank Gorham. At approximately 7:30 p.m. the three went to room 421 to conduct a "knock and talk" with Henry.[3] *See Florida v. Jardines*, 133 S. Ct. 1409, 1423 (2013) (Alito, J., dissenting) (defining a "knock and talk" as knocking on the door and seeking to speak to an occupant for purposes of gathering evidence). Townsend and Keller were in plain clothes, with their badges in badge-holder lanyards around their necks. Sergeant Gorham was also in plain clothes, but was wearing a tactical police vest. Their guns were not drawn.

---

[3] At some point during the encounter, Townsend had called for additional assistance, and a fourth Portland police officer (Officer Gowen) had arrived and was stationed inside or near the motel room.

The hallway outside the motel room was strewn with drug paraphernalia and the officers observed various people in the hallway who, they suspected, were engaged in drug and prostitution-related activities.[4] After knocking on the door of Henry's room and then announcing their presence as police officers, the police could hear movement inside the room, the sounds of a toilet flushing and water running, people moving about quickly, and the sound of something like a metal object hitting the floor. Henry opened the door to the room after approximately 90 seconds. The officers recognized him from a prior booking photograph and from previously seeing him around the city. The motel room was in disarray, it had the haze and smell of recently smoked marijuana, and there was a towel that had been wrapped around the door opening to mask the smell of marijuana from the hall.

Townsend introduced himself as a Portland police officer and told Henry they wanted to speak to him and ask him questions, and, mentioning the activity and traffic in the hallway, asked if they could step inside so that other persons in the hallway would not be able to hear their conversation. Henry told the officers to come in and he stepped aside and held the door open as the officers entered.

As Townsend and the other officers walked past Henry and entered the motel room, Townsend performed a protective sweep of the room to, in his words, "make sure there was not anyone who was going to pose a threat." He checked in-between the two beds, the space between the first bed and the bathroom, and in the far corner

---

[4] Officer Townsend explained that there were "people coming and going from one room to the other, females asking for whoever was inside the other room. The fact that they [the females] didn't know who they were, [gave rise to] our feeling there might be some prostitution going on in some of those other rooms." Townsend also saw various drug paraphernalia on the floor of the hallway.

of the room past the second bed. In so doing, he observed a bag containing what appeared to be marijuana on a chair at the foot of one of the beds. Townsend estimated that the bag contained 1.5 grams of marijuana.

Having completed his sweep, Townsend positioned himself in the middle of the room facing the door and engaged in conversation with Henry, speaking in a cordial and normal manner. The officers could see that a light was on in the bathroom and heard water running and movements coming from inside it. Townsend asked Henry who was in the bathroom, and he responded, "my girl." When asked her name, Henry paused and then responded, "Big Sasha." When asked what her real name was, Henry paused and then said he thought her name was "Allure" or something to that effect. The fact that Henry was not sure of the woman's name and did not know her last name caused Townsend to believe "we were on to something." Henry then told Townsend that the girl was from Michigan[5] and he appeared much more anxious than he had been at first.

The officers requested the person in the bathroom to step out. The bathroom door opened and a young woman, later identified as A.H., exited. Officer Keller recognized A.H. from a photograph and he asked her to step into the hallway so that he could speak to her in private. Henry protested and yelled at A.H. that she did not need to speak to the police or answer their questions. Because Henry became

---

[5] Officer Keller testified that because the police had no leads about A.H.'s specific whereabouts in Portland, he was "blown away" and "shocked" when Henry stated that the girl was from Michigan.

increasingly excited as A.H. left the room, Townsend asked Henry to sit in a chair near the corner of the room, which he did.[6]

Townsend spoke to Henry in a conversational manner and Sergeant Gorham remained in the room with Townsend and Henry. Townsend intentionally kept a clear passage between where Henry was seated and the room's door so that Henry could exit if he wished, because Townsend did not want to create a custodial situation.

From their conversation, Townsend learned that Henry did not have a fixed address and knew very little about A.H. Townsend observed Henry becoming more nervous and glancing repeatedly at a leather jacket hanging on the clothes rack in the corner of the room. Henry appeared concerned about whatever was over there. There was a metal hanger on the floor near the rack, and Townsend surmised that the hanger was the source of the metal sound they had heard immediately after they had knocked on the door. Townsend had also observed that one of the coat hangers on the rack was swaying when he first entered the room.

Henry glanced repeatedly at a visible bulge in one of the pockets of the leather jacket. Knowing that Henry had a weapons history, Townsend became concerned that there might be a weapon in the jacket. Accordingly, Townsend patted the outside of the jacket and could feel and hear the distinct sound of something that was familiar and which he recognized as being a large amount of cash wrapped in plastic. He took the object out of the pocket and it was a single plastic bag with a large amount of U.S.

---

[6] Henry appeared nervous and, at one point, began to put on very large costume jewelry rings. Townsend asked him not to put the rings on because Townsend was concerned that they could be used as a weapon. Henry obliged Townsend's request.

currency wrapped in three separate plastic bags, about four inches thick in all, folded in different denominations with rubber bands. The cash was later determined to total approximately $12,700. Henry claimed the money was given to him by his mother, but he could not explain why he did not keep it in a more secure location.

Townsend next searched a suitcase that was resting underneath the leather jacket at the bottom of the clothes rack, but he found no weapons in it. Finally, Townsend patted down Henry, who was clothed only in shorts and a t-shirt, and found an additional $300 on his person.[7]

Townsend also observed two cell phones in the room: an iPhone sitting on the bed and a Nokia plugged into the wall next to the television. When questioned, Henry stated that he used the iPhone for pictures and similar things, and that the Nokia telephone "really wasn't his." Townsend observed Henry become very anxious when he was asked about the cell phones. Henry's statement that he used the iPhone to take pictures was significant to Townsend because people engaged in sex trafficking often take photographs of their prostitutes and post the photographs on websites, and cell phones are needed to set up "dates" and communicate with prostitutes. Townsend asked Henry for the phone numbers of the phones and for the password for the iPhone, which Henry provided.[8]

---

[7] Without any prompting from Townsend, Henry also pulled his shorts down.

[8] When asked whether he "punched" the password into the iPhone at that time, Townsend testified, "I can't recall if I did it right then or I just wrote it down." When next asked, "Didn't you observe that some information came up when you punched that in?", Townsend testified, "I don't recall that." To the extent that the parties dispute whether Townsend entered the password into one of the phones while in the motel room with Henry on February 12, I find that Townsend did not enter the password into the phone.

The only belongings in the room that appeared to be A.H.'s were a purse, deodorant, women's hygiene products, and a notebook with a photograph of Marilyn Monroe in it. A.H. had no clothing or luggage in the room, suggesting to Townsend that A.H. had arrived in Portland without any clothing or money to buy clothing. The fact that A.H. had few possessions suggested to Townsend that A.H. had been coerced by Henry to come with him to Maine.

A.H. was interviewed separately by Officer Keller. A.H. confirmed that she did not have any clothing with her other than the clothing she was wearing, and that she had no money in her possession. She stated that she had met Henry in Brooklyn, New York, they had driven to Maine, she had known him for a couple of days, and she was unable to tell Keller his—Henry's—name. She stated that Henry treats her "okay," but that she did not want to stay with him and did not want to go back to the room. She also told Keller that she had seen a silver firearm in the room the day before. After the interview, Keller assisted A.H., who he learned was 19-years-old, in finding a safe place for her to stay.

After speaking to Keller, Townsend called Maine Assistant Attorney General Leanne Sutton. She told Townsend to seize the phones and the money, and to apply for a search warrant.

 Townsend told Henry that the police would seek a search warrant to search the motel room and that if he did not want to wait while the search warrant was obtained, he could leave after Townsend checked the clothing and any other items Henry wanted to take with him. Townsend issued Henry a summons for possession

of a useable amount of marijuana.  Henry got dressed and left.  The entire encounter

in the motel room lasted between 10 to 15 minutes.

## C.    First Search Warrant

The police secured the motel room.  Keller applied for and obtained a search

warrant that was issued by a Maine Superior Court Justice at 12:56 a.m. on February

13.  ECF No. 31-1, p. 4.  The subsequent search of the motel room and Henry's car

failed to uncover any additional evidence of drug or sex trafficking, or a firearm.

## D.    Second Search Warrant

Townsend sought a second state search warrant a week later on February 20.

The warrant request was supported by Townsend's affidavit that included the

following information he and Keller obtained from A.H. when they conducted a second

interview with her on February 13, the day after their initial encounter:

VII.    On 02/13/14, Officer Keller and I spoke with H[ ] about how she
came to Portland, ME.  In substance, H[ ] told me that she had
worked as a prostitute in the past, and around the time of
02/09/14, she was walking around the area of Brooklyn.  H[ ]
describes that Henry approached her, and asked her if she would
work for him (as a prostitute).  Henry told her that he was going
to come to Boston, MA, but they eventually came to Portland, ME
for the purposes of prostitution.  Henry took photographs of her
body to post on the website of backpage.com with his Apple
iPhone.  H[ ] said that he had tried to post the advertisements to
backpage.com, but was unable to do so because of a setting on his
phone.

VIII.   H[ ] said that her movements were controlled while she was in
the room, and Henry had told her she was not allowed to make
outgoing calls.  H[ ] described Henry threatening her multiple
times over the course of the previous 3 or 4 days that she was
staying in the hotel room.  H[ ] also described a gross sexual
assault in which Henry forced H[ ] to perform oral sex on Henry.
H[ ] said that she did not push Henry off or tell him no, because
she feared Henry had the firearm, and feared that he would kick

her out onto the street. *[Affiant Note: Due to my education training and experience, I know that subjects who traffic female victims utilize force, fraud, and coercion to control their victims.]* H[ ] also described Henry forcing her to place cocaine base (crack) in her vagina to transport the drugs to 2 residences.

ECF No. 31-2, p. 6.

The second warrant authorized the search of the iPhone and Nokia cell phone that had been seized pursuant to the first search warrant and stored at the Portland Police Headquarters. The warrant specifically authorized the seizure of evidence related to the crimes of Aggravated Sex Trafficking (Class B) and Aggravated Trafficking of Scheduled Drugs (Class A), including the following provisions which are relevant to the issues at hand:

7. All Stored communications – (without date range) to include:

i.    All audio files to include voicemail messages and voice notes

ii.   All phonebook and contact lists to include phone numbers and email addresses

iii.  All emails to include incoming and outgoing

iv.   All calendar information, including all synced calendars

v.    All text message detail (incoming and outgoing), and text message content;

vi.   All GPS directions

vii.  WiFi network information, to include SSID (Network name) and GPS information of the network;

viii. All IP session information and IP destination information;

ix.   All Internet history and usage to include websites visited, searched terms and cookies

x.    And, any account information, settings, and saved usage information for any and all installed applications, also known as "apps" on the device.

ECF No. 31-2, p. 2. The warrant further authorized the making of an exact duplicate image of the electronic data stored on each cell phone by a qualified forensic examiner.

The forensic examination of Henry's iPhone that followed the issuance of the second search warrant revealed a video located in an application on the phone. The video depicted Henry engaged in sexual intercourse with a young woman who Keller recognized as being the fifteen-year-old girl who had been reported missing the previous July. The video was stored in an application entitled TangoME, which had been used to send it to a Yahoo.com email account.

## E.  Third Search Warrant

Keller notified Special Agent David Pawson from Homeland Security Investigations, a federal agency that focuses, among other things, on crimes involving the sexual exploitation of children. Pawson viewed the video, confirmed that it depicted what appeared to be the sexual exploitation of a child, and took custody of the iPhone.

The next day, Pawson applied for a federal search warrant to authorize a search of the iPhone for evidence including, but not limited to:

> 1.  All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1591, 2251, 2421, and 2423, including the following:
>
>> a. digital records and content stored on the phone memory related to the production of child pornography or sex trafficking;
>>
>> b.  text messages regarding the production of child pornography or sex trafficking;
>>
>> c.   pictures and call logs related to the production of child pornography or sex trafficking.

2.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

A search warrant was issued by a Federal Magistrate Judge on March 7, 2014. ECF No. 31-3.  The forensic search of the iPhone that followed revealed additional videos of the fifteen-year-old girl and Henry engaged in sexual conduct.  Pawson then sought and obtained a federal arrest warrant authorizing Henry's arrest.

**F.    Henry's Arrest and Questioning; Issuance of Fourth Search Warrant**

Officer Keller performed a traffic stop of a vehicle Henry was driving on April 16, 2014, and placed Henry under arrest.  Special Agent Pawson arrived at the scene, took custody of Henry, and transported him, along with HSI Special Agent James Bell, to their office in South Portland.  Henry was not read his *Miranda* rights.  Henry was insistent that he wanted to "state his case" to Pawson.  Pawson told Henry at least three or four different times during the ten-minute trip to the HSI office that it was not a good idea for him to talk then.  At no point during the trip did Henry ask for an attorney.

Pawson was joined at the HSI facility by FBI Special Agent Christopher Peavey.   Henry was first placed in a holding cell, and then moved to a processing room where he, Pawson, and Peavey were seated at a desk.  Henry was wearing leg irons, but was not handcuffed.  After engaging in small talk and a brief discussion

regarding Henry's educational and family background, Pawson advised Henry that he was charged with the sexual exploitation of a minor and that he, Pawson, would advise him of his *Miranda* rights using a written form. Henry explained to Pawson that he had had his rights read to him several times, that he understood his rights, and that there was no need to fill out the form. Pawson nonetheless insisted that the form be completed.

Pawson read the *Miranda* rights from the form, and Henry was provided a copy of the form to read as Pawson read the rights. Pawson had Henry initial each right printed on the form as Pawson read the right to him. After Pawson read all of the rights to Henry, Henry signed the form. Henry then agreed to speak with Pawson and he signed the waiver portion of the form acknowledging that he had read the form and waived his rights. At no time during this period did Henry ask to speak to an attorney. During the interview that followed, Henry told Pawson that he had sent the video stored on the TangoME application in his iPhone to a woman at her Yahoo.com account.

The entire interrogation lasted approximately 1.5 to 2 hours. At no time during the interrogation did Henry ask to speak to an attorney. Henry was then transported to the Cumberland County Jail. While being transported, Henry told Pawson that he had a lawyer. He was permitted to make a phone call while being transported and Henry called a woman.[9]

---

[9] The evidence does not establish whether the woman Henry called was an attorney.

In response to Henry's statement that he had sent the video stored on the TangoMe application to another person, Pawson performed a manual search of the TangoMe application on the iPhone which revealed that the video had been sent to a total of ten people. The iPhone also contained photographs of A.H., taken in a bathroom, that depicted her pulling her pants down and displaying her genitalia and breasts. Pawson subsequently sought and obtained a second federal search warrant authorizing the seizure of evidence from TangoMe, the social networking site Henry had used, related to distribution of the video. A second federal search warrant issued on April 29, 2014. ECF No. 31-4.

## II. Legal Analysis

### A. Motion to Suppress

Henry challenges the legality of all of the search and seizure activity and questioning by the Portland police, Homeland Security, and the FBI.

### 1. Entry into the Motel Room by the Portland Police.

Henry contends that the Portland police unlawfully entered his motel room without his consent and without any other legal justification for a warrantless entry.

As my factual findings establish, Officers Townsend and Keller, and Sergeant Gorham, entered the motel room after having identified themselves as police officers and requesting permission to enter for the purpose of asking questions. Henry verbally consented to their entry and facilitated it by standing aside and holding the door. A warrantless entry into a person's home—or rented motel room—is permitted when a person voluntarily consents to the same. *See Illinois v. Rodriquez*, 497 U.S.

177, 181 (1990) (a warrantless entry is permitted where "voluntary consent has been obtained"); *see also United States v. Marshall*, 348 F.3d 281, 285-86 (1st Cir. 2003) ("Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given."). Although Henry denies having consented to the entry, I credit the officers' testimony on this point and, having considered the totality of the circumstances, conclude by a preponderance of the evidence that Henry's consent was knowing, intelligent, and voluntary.[10]

### 2. "Protective Sweep" of the Motel Room

Henry challenges Townsend's initial actions after entering the motel room as an unlawful "protective sweep" of the motel room because it was not incident to an arrest or pursuant to a search warrant, and there is no legal justification for a protective sweep incident to a "knock and talk." The Government counters that, under the circumstances, a protective sweep was justified and, in the alternative, that no protective sweep took place because "Officer Townsend was lawfully in the motel room by the defendant's consent, and his 'protective sweep' did not take him into adjoining space or other rooms." ECF No. 31, p. 10. I am not persuaded by this latter rationalization. Townsend received Henry's consent to enter the motel room so they could speak outside of the earshot of other persons in the motel's hallway. Townsend's entry beyond the doorway area and visual inspection between the beds

---

[10] Because I find the testimony of Officers Townsend and Keller and Special Agents Pawson and Peavey more reliable than Henry's testimony, I have relied primarily upon their testimony in making factual findings regarding the key factual disputes.

and other areas in the motel room was, in effect, an inspection of adjoining space. Accordingly, I treat his actions as constituting a protective sweep.

The Supreme Court addressed the circumstances in which a warrantless protective sweep is permitted in *Maryland v. Buie*, 494 U.S. 325, 334-35 (1990):

> [A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long,* and as in those cases, we think this balance is the proper one.

> We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.  The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

Although *Buie* concerned a protective sweep incident to an arrest, several Circuits, including the First Circuit, have recognized that the doctrine is not limited to sweeps incident to arrest and have applied the doctrine to other circumstances in which police have lawfully entered a home.  *See United States v. Martins*, 413 F.3d 139, 149-150 (1st Cir. 2005) (concluding that a protective sweep may be performed where police enter a home based on exigent circumstances); *United States v. Daoust*, 916 F.2d 757, 759 (1st Cir. 1990) (concluding that a protective sweep may be performed incident to a search warrant); *United States v. Patrick*, 959 F.2d 991, 996 (D.C. Cir. 1992) (concluding that a protective sweep may be performed incident to a

consent entry); *but see United States v. Hassock*, 631 F.3d 79, 88-89 (2d Cir. 2011) (concluding that a protective sweep was not supported where the justification for the agents going to an apartment—to question and possibly arrest a specific individual— no longer existed and the sweep itself became the purpose of the agents' continued presence in the apartment). [11] As emphasized in *Martins*, the "key is the reasonableness of the belief that the officer's safety or the safety of others may be at risk." *Martins*, 413 F.3d at 150.

At the time Townsend performed his protective sweep of the motel room, he knew that Henry had a history of charges related to drug distribution, firearms, and resisting arrest; had heard the sounds of a person or persons moving in the room, the toilet flushing, water running, and metal hitting the floor after he had knocked on the door, all of which was consistent with the possible destruction or hiding of contraband; had observed the haze and smell of marijuana smoke in the motel room; and was aware of the presence of an unknown person behind the closed bathroom door whom Henry could not fully identify. Townsend's concern for his own safety and the safety of his colleagues was heightened because the motel room was a confined space and they did not have their weapons drawn.

The protective sweep was consistent with the officers' purpose for being in the room—to speak to Henry—and served to ensure their safety. This is not a case in which the officers "undertook a full search for the object of their inquiry rather than a protective sweep incident to an *independent* lawful purpose." *United States v. Fadul*,

---

[11] There is a circuit split as to whether the protective sweep doctrine applies to consent entries.

--- F.Supp.2d ---, 2014 WL 1584044 (S.D. N.Y. 2014) (quoting *Hassock*, 631 F.3d at 89). The independent lawful purpose here was the officers' desire to speak to Townsend regarding the possible abduction of A.H. In furtherance of that purpose, Townsend spoke with Henry both during and after completing the sweep. Under these circumstances, Townsend's brief and limited sweep of the motel room for safety purposes beyond the vicinity of the room's doorway was objectively reasonable.

### 3. Custodial Interrogation

Henry contends that he was subjected to a custodial interrogation without having been given *Miranda* warnings after A.H. left the motel room, asserting that he repeatedly tried to leave the room.

The evidence as to whether Henry was prevented from leaving the room is in dispute. I find Townsend's testimony on this point to be the most credible. Townsend requested Henry to sit in the chair as they conversed because he, Townsend, felt safer with Henry seated. He did not command Henry to sit in the chair, and Henry got out of the chair and walked around the room several times. In addition, Henry's access to the doorway was unobstructed and he could have walked out of the room if he wanted to. Townsend never told Henry he had to stay in the room or that he could not leave. In fact, Henry left the motel room after 10 to 15 minutes had transpired and the police had decided to apply for a warrant to search the room.

*Miranda* warnings are required when, viewed objectively, the circumstances surrounding the interrogation give rise to "the requisite 'restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Hughes*,

640 F.3d 428, 435 (1st Cir. 2011) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The First Circuit has emphasized that "the determination of whether custody exists 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Hughes*, 640 F.3d at 435 (quoting *Stansbury v. California,* 511 U.S. 318, 323 (1994)). Four factors, among others, "may inform a determination of whether, short of actual arrest, an individual is in custody. These factors include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" *Hughes*, 640 F.3d at 435 (quoting *United States v. Ventura,* 85 F.3d 708, 711 (1st Cir. 1996)).

Here, Henry was not in custody for Miranda purposes because (1) he was questioned in a neutral setting—his motel room; (2) there were between one to three officers present at any given time, but Henry was questioned exclusively by Officer Townsend while the others, if in the room, stood by; (3) the officers did not engage in any display of force, Henry was not physically restrained, and there were no obstructions preventing him from walking across the room and out the door; and (4) the questioning was conversational and lasted no more than 10 to 15 minutes. *See Hughes*, 640 F.3d at 436-37 (concluding that the defendant was not in custody for *Miranda* purposes where he was not restrained, the officers did not brandish their weapons, the conversation was calm and polite, and the interview lasted approximately 90 minutes).

4. **Search of the Leather Jacket and Removal of the Cash from the Jacket's Pocket**

Henry challenges Officer Townsend's warrantless pat-down of the outside of the leather jacket as having no legally justifiable basis. The Government contends that, at that point in the encounter, the situation had evolved into a *Terry* investigatory stop and a pat-down search was permissible because the police had a reasonable, articulable suspicion that criminal activity was afoot. *See Terry v. Ohio,* 392 U.S. 1 (1968); *see also United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004). The Government further argues that once Officer Townsend recognized that the jacket pocket contained a large amount of money wrapped in plastic, he was justified in removing the cash from the pocket and seizing it as possible crime-related contraband pursuant to the "Plain Feel" doctrine. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (permitting an officer who "lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent" to seize the contraband).

As part of a *Terry* stop, a police officer may perform a pat-down search of the person stopped "if the officer has some articulable, reasonable suspicion that the persons stopped may be dangerous." *United States v. Tiru-Plaza*, 766 F.3d 111, 116 (1st Cir. 2014) (quotations omitted). The rationale for police to perform a pat-down search as part of a *Terry* investigatory stop is to protect officer safety. *Romain*, 393 F.3d at 75 (recognizing that *Terry* serves "to address the need for officer safety in the course of *all* legitimate investigative activities.") (emphasis in original). This need exists whether the investigatory stop occurs on the street or in a home or motel room.

*Id.*; *see also United States v. Beaudoin,* 362 F.3d 60, 67–69 (1st Cir. 2004), *cert. denied,* 543 U.S. 979 (2004) (concluding that a valid, *Terry*-type search was conducted where police commanded a suspect to step out of the opened doorway of his motel room). Depending on the circumstances, a pat-down search may not be restricted to the body of the person being investigated, but may extend to areas within the immediate vicinity or control of that person. *See Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (applying *Terry* standards to the passenger compartment of an automobile); *United States v. Thomson*, 354 F.3d 1197, 1201 (10th Cir. 2003) (applying *Terry* standards to a duffel bag near the suspect).

The leather jacket was hanging on an unenclosed clothes-rack that was affixed to the wall directly across and approximately eight feet from where Henry was seated. Townsend's attention was drawn to the jacket because he observed Henry grow nervous and repeatedly look at the jacket, and there was a large bulge in the jacket pocket which Townsend suspected might be a weapon. In addition, Townsend had observed one of the metal hangars on the rack visibly swaying, and a second metal hanger on the floor, suggesting that the coat rack and possibly the jacket itself were accessed by Henry in the commotion that ensued when Townsend first knocked on the motel room's door and announced that it was the police. There was good reason for Townsend to have become focused on the bulge in the pocket of the leather jacket.

The totality of the circumstances establish that Officer Townsend had a reasonable, articulable suspicion that criminal activity was afoot at the time he decided to pat down the leather coat. He knew that the motel in South Portland was

a location frequented by people engaged in sex and drug trafficking, and upon his arrival he observed people who appeared to be engaged in such activities; Henry had a history in New York related to charges of drug distribution, sex trafficking, weapons, and resisting arrest or a similar offense; Henry had been identified by Maine law enforcement agencies as a person involved in drug trafficking and sex trafficking in the Portland area; Henry had been linked to the disappearance of a 15-year-old girl from Portland in July 2013; A.H., who had called her mother and stated that she was in Maine and being held against her will, had been found in the bathroom of Henry's motel room, and she had no luggage or clothes; Henry did not know A.H.'s actual name; the motel room was in disarray, there was marijuana found in plain sight, and the room smelled and had a haze from burnt marijuana; Townsend had heard sounds consistent with the movement of a person or persons attempting to dispose of or hide contraband immediately before Henry opened the motel room's door; and Henry had become agitated as A.H. left the room with Officer Keller, and he appeared to attempt to control her by yelling to her that she did not need to talk to the police.

At the time Officer Townsend decided to pat down the leather jacket, he had a reasonable suspicion Henry had been involved in the commission of a crime or crimes related to drugs and sex-trafficking, and that the leather jacket, which was just a few steps from where Henry was seated, might contain a gun or other weapon. He also observed that Henry was growing increasingly agitated and might pose a danger to him and the other officers present. The totality of the circumstances demonstrate that Officer Townsend's apprehension of danger was reasonable. *See United States*

*v. Arnott*, 758 F.3d 40 (1st Cir. 2014) (concluding that an officer's apprehension of danger was reasonable where the suspect appeared unduly nervous and the police had strong reasons to believe the suspect had just completed a drug-related transaction); *Romain*, 393 F.3d 3 at 72 (concluding that an officer's apprehension of danger was reasonable where suspect was belligerent and the officer had reason to believe the suspect may be armed). Accordingly, his pat-down search of the leather jacket was lawful.

I reach the same conclusion with respect to Officer Townsend's removal of the cash from the jacket pocket and his seizure of it as crime-related contraband. From what he felt and heard as he patted down the jacket, Officer Townsend recognized the bulge in the pocket as a large amount of cash wrapped in plastic. He viewed the cash as possible contraband because, as he testified, people "engaged in drug trafficking and sex trafficking oftentimes . . . carry large amounts of money with them either from a drug sale or oftentimes, for the sale of a prostitute, as well as just funds from a girl that's working for [the] sex trafficker[.]"

It was lawful for Townsend to remove the money from the jacket pocket because his pat-down of the pocket revealed "an object whose contour or mass makes its identity immediately apparent." *United States v. Proctor*, 148 F.3d 39, 43 (1st Cir. 1998) (quoting *Minnesota v. Dickinson*, 508 U.S. 366, 375 (1993)). Under the totality of the circumstances, the incriminating character of the money was immediately apparent and Officer Townsend had probable cause to seize the cash as suspected evidence of the proceeds of illegal sex trafficking. *See State v. Silva*, 742 F.3d 1, 7 (1st

Cir. 2014) (quoting *Robinson v. Cook,* 706 F.3d 25, 31–32 (1st Cir. 2013), *cert. denied,* --- U.S. ---, 133 S. Ct. 2831 (2013)) ("Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that contraband or evidence of a crime will be found.'"). Although Henry cites two decisions in opposition to this conclusion, both are distinguishable from the circumstances presented here.

In *United States v. Schiavo*, 29 F.3d 6 (1st Cir. 1994), where the suppression of a bag of money obtained in a *Terry* search was upheld, the officer in question admitted that he did not know what the bag contained after conducting his pat-down search. *Id.* at 9. Because the incriminating nature of the bag was not immediately apparent to the officer during this initial frisk, suppression was proper under *Dickerson. Id.* Here, however, Officer Townsend recognized from his initial pat-down that the bulge in Henry's pocket was a large amount of cash.

Also distinguishable is *United States v. Camacho*, 661 F.3d 718 (1st Cir. 2011). There, the seizure of a weapon in a *Terry* search was found to be unlawful when the officer in question lacked sufficiently reasonable suspicion to make the initial *Terry* stop – making the subsequent frisk "fruit of the poisonous tree." *Id.* at 728. In contrast, Officer Townsend had the appropriate reasonable suspicion that Henry had been involved in illegal activity when he decided to conduct a *Terry* pat-down.

The warrantless seizure of an otherwise legal object found in plain view is reasonable where an officer is justified in being in the position to find the object, the discovery is inadvertent, and the incriminating nature of the object is immediately

apparent.  *United States v. Rutkowski*, 877 F.2d 139, 140-41 (1st Cir. 1989).  Because Officer Townsend was legally justified in conducting a *Terry* pat-down of the jacket, discovered the cash inadvertently, and was immediately aware of the cash's incriminating nature given all of the surrounding circumstances, he had probable cause to seize the cash as evidence of the proceeds of sex trafficking.[12]

### 5. **Pat-Down of Henry and Removal of Cash from Henry's Shorts Pocket**

Henry asserts that Officer Townsend lacked legal authority to frisk him after the discovery of the cash in the jacket, and to remove the wad of cash Townsend felt in the pocket of Henry's shorts.  However, the safety concerns that supported Townsend's pat-down of the leather jacket similarly supported his decision to frisk Henry's person.  Once Townsend felt a wad of cash in the pocket of Henry's shorts, he had probable cause to seize it because, in view of the large amount of cash he had discovered moments earlier, the incriminating nature of the wad of cash in Henry's pocket was immediately apparent to him.

---

[12] I am not persuaded by the government's additional contention that the search of the jacket was authorized by the exigent circumstances exception to the warrant requirement. "Exigent circumstances are present where lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008) (concluding that a warrantless search under a motel mattress was supported by exigent circumstances where a police officer could hear a firearm being chambered behind a motel room's closed door moments before the officer entered the room); *see also United States v. Lopez*, 989 F.2d 24, 26 (1st Cir. 1993) (concluding that a warrantless search in the bathroom of an apartment was supported by exigent circumstances where the police had reason to believe that a sawed-off shotgun had been hidden in the apartment and was close at hand).  "Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency." *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011).

### 6. Seizure of the Cell Phones

Henry challenges Officer's Townsend's seizure of the two cell phones. The Government contends that the phones were lawfully seized based on probable cause.

Townsend observed Henry become anxious when he questioned him about the phones. Henry stated that he used the iPhone to take pictures, which was consistent with Townsend's suspicion that Henry was engaged in sex trafficking and needed a phone to post pictures of prostitutes on the web, arrange "dates," and communicate with prostitutes through text messages and emails. Moreover, Townsend had cause to believe that Henry had a trafficking relationship with A.H. given all of the information he and Keller had collected up to that point and having just discovered large sums of cash in Henry's possession.

Townsend's seizure of the cell phones was lawful. He found them in plain view after having acquired sufficient information to have probable cause to believe that the phones were contraband associated with sex trafficking. In addition, he was justified in being in the motel room and in a position to view the cell phones, his discovery of the cell phones was, in effect, inadvertent, and the incriminating nature of the cell phones was immediately apparent to him. *See Rutkowski*, 877 F.2d at 140-41.

### 7. *Franks* Challenge to The First and Second Warrant Affidavits

Henry seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), in order to challenge the sufficiency of the affidavit prepared by Officer Keller to obtain the first state search warrant. A *Franks* hearing is held only if the defendant

makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155-56. "A comparable showing is required if the defendant would establish that technically accurate statements by an affiant have been rendered misleading by material omissions." *United States v. Scalia,* 993 F.2d 984, 987 (1st Cir. 1993); *see also United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002) ("A material omission of information may also trigger a *Franks* hearing."). Henry contends that the affidavit prepared by Officer Keller on February 13, 2014, contained a material omission because it failed to disclose information known to the police regarding A.H.'s low cognition and mental health diagnosis.

Based on the evidence presented and the Government's admission, *see* ECF No. 31, p. 24, I find that Officer Keller knew at the time he prepared his February 13 affidavit that A.H. had a low IQ and the mental aptitude of an 11 or 12-year-old child, and had a history of unspecified mental illness. The question presented is whether the omission of this information from his affidavit was material to such a degree that had the judicial officer been so informed, the officer would have been unwilling to rely on the information included in the affidavit that was attributed to A.H.

I conclude that if the omitted information had been included in the affidavit it would not have affected the probable cause determination. A person's substantially low IQ and unspecified mental health diagnosis do not automatically render that

person an inherently unreliable reporter of information.  *See Silva*, 742 F.3d at 9 (finding District Court did not err in denying motion to suppress after holding *Franks* hearing, when affidavit failed to include witness' mental health issues, because disclosure would not have undercut finding of probable cause); *United States v. Adams*, 305 F.3d 30 (1st Cir. 2002) (finding that it was not error for District Court to refuse to hold a *Franks* hearing when affidavit had omitted the fact that informant had been selling cocaine, because affidavit would still provide probable cause even if information about the informant was disclosed).  Moreover, the fact that A.H. has a low IQ and the mental aptitude of an 11 or 12-year-old, establishes that she is more susceptible than most adult persons to the type of coercion associated with sex trafficking.  If the omitted information had been included in the affidavit it would have bolstered the probable cause determination in this case.

With respect to Officer Townsend's February 20, 2014, affidavit submitted in connection with the second search warrant authorizing the search of the iPhone, I find that Townsend knew but failed to include in his affidavit that (1) A.H. had an IQ of 60 and functioned at the level of an 11-year-old; (2) A.H. had previously been diagnosed with bipolar disorder and had not taken her medication since October 2013; (3) A.H. had run away from the initial safe location she had been brought to, but had then been brought to another location and was receiving mental health care; (4) three social workers were working to find a long-term care facility for A.H. as a victim of sex trafficking.[13]

---

[13]  These findings are based on Defendant's Exhibit 14.

The significant additional information omitted from the second warrant affidavit was A.H.'s specific IQ of 60, and that she had been diagnosed with bipolar disorder and had not taken her medication. Although this additional information was, no doubt, relevant to A.H.'s reliability as a reporter of information concerning Henry and her own circumstances, I find that a reasonable judicial officer would still have found probable cause if the additional information had been included in the affidavit. It is not unusual in the judicial process for fact-finding to be based on information provided by individuals with limited intelligence, mental health diagnoses, substance dependency, and other conditions that may impair their ability to be reliable witnesses. The information provided by such people is neither inherently nor presumptively untrustworthy. Furthermore, the additional details regarding A.H.'s specific IQ, her mental health diagnosis, and that she was un-medicated lends support for the conclusion that she was a particularly vulnerable person who could easily have been coerced into prostitution by a sex trafficker. Viewed in that light, the omitted information supports the probable cause determination.

For the foregoing reasons, I conclude that Henry has failed to make the preliminary showing required before a *Franks* hearing may be held.

### 8. The Breadth of the February 13, 2014, Search Warrant

Henry contends that the February 13, 2014, search warrant was overbroad because it authorized a search into all aspects of his phones. ECF No. Doc. No. 26, p. 27.

The February 13 warrant was not overbroad because it specified that the information to be seized from the telephones was "electronically stored information including phone numbers, names, text messages, voice recordings, photographs, video clips, date and time stamps, and other electronic information all as relate to the trafficking, furnishing, and/or possession of scheduled drugs[.]"  Moreover, there is no evidence that either of Henry's cell phones were searched pursuant to the February 13 warrant.  Instead, the cell phones were searched pursuant to the February 20, 2014 search warrant which contained a detailed list of the specific information on the phones that was subject to seizure.  Henry does not challenge the February 20 warrant as being overbroad.

Because the cell phones were not searched pursuant to the February 13 search warrant, Henry's challenge to the February 13 warrant is moot.

### 9.  The Specificity of the February 20, 2014, Search Warrant

At hearing, Henry also argued that video and related information that the police obtained from the iPhone as a result of the February 20 search warrant was outside the scope of what the warrant authorized could be seized.

The February 20 search warrant listed seven categories of information that was property or evidence to be seized.  None mention videos stored on the cell phones.  The ensuing examination of the iPhone resulted in the discovery of the video depicting Henry engaged in sex acts with a girl who Officer Keller recognized as the fifteen-year-old who had been missing the previous July.  The video was stored in an application on the iPhone entitled TangoME, which had been used to transmit the

video to other persons.  The video was not, therefore, found stored in the iPhone's pre-installed photo and camera feature.

Among the seven categories of information listed in the February 20 search warrant was the following:

> 7.    All Stored communications – (without date range) to include:
>
> *       *       *
>
> x.    And, any account information, settings, and saved usage information for any and all installed applications, also known as "apps" on the device.

Applying the commonly accepted meaning of the words "saved," "usage," and "information,"[14] I conclude that the video and the data related to its transmission were a form of *stored communications* within the bounds of the warrant because they are *information* that was *saved* on Henry's iPhone related to the *usage* of the TangoMe app installed on the phone.  The seizure of the video and related data was, therefore, authorized by the search warrant.

## 10.  Invocation of Right to Counsel

Henry contends that following his arrest on April 16, 2014, but before his interrogation by HSI Special Agent Pawson and FBI Special Agent Peavey, he invoked his Fifth Amendment right to counsel by telling Pawson that he wanted to speak to his lawyer, attorney Christine Hanley.  Henry further contends that Pawson failed to honor his request, and told him that attorney Hanley did not handle federal

---

[14] Neither the Government nor Henry have suggested that "saved usage information" is a technical term with a defined meaning within the field of computer science.

cases and that he would receive a "federal lawyer" when he got to federal court. Special Agent Pawson testified that Henry did not mention his lawyer until after the interview was completed and Pawson was transporting Henry to the Cumberland County Jail.

I find Pawson's testimony regarding this disputed fact to be more credible and determine that Henry did not invoke his right to counsel following his arrest on April 16 prior to or during the interrogation conducted by Special Agents Pawson and Peavey.

### III. Conclusion

Defendant Paul Henry's motion to suppress is ordered **DENIED**.

**SO ORDERED.**

/s/ Jon D. Levy_____
U.S. District Judge

Dated this 17th day of October, 2014.